IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                      Criminal No. 3:24-cr-146

WAHEED RICHARDSON,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM SEIZURE AND SEARCH (ECF No. 46) ("Renewed Motion to Suppress"), the GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE (ECF No. 48) ("Resp."), the DEFENDANT'S REPLY (ECF No. 52) ("Reply"), the DEFENDANT'S SUPPLEMENTAL MEMORANDUM (ECF No. 61) ("Sup. Mem."), the GOVERNMENT'S SUPPLEMENTAL BRIEF PURSUANT TO THE ORDER AT ECF NO. 58, AND IN RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF PURSUANT TO THE SAME (ECF No. 62) ("Sup. Resp."), and the DEFENDANT'S REPLY (ECF No. 63) ("Sup. Reply"). Having reviewed the papers and for the reasons set forth below, the Renewed Motion to Suppress will be DENIED.

## PROCEDURAL BACKGROUND

On October 1, 2024, a grand jury returned the INDICTMENT (ECF No. 3) that charged Waheed Richardson ("Defendant" or

"Richardson") with one count of Possession of a Firearm by a Convicted Felon ("COUNT I"). ECF No. 3. On October 24, 2024, Richardson filed the following motions: (1) MR. RICHARDSON'S MOTION TO DISMISS COUNT ONE OF THE INDICTMENT (ECF No. 18) (the "Bruen Motion to Dismiss"); (2) DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM PHONE WARRANT (ECF No. 19) (the "Cell Phone Motion to Suppress"); and (3) DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM SEIZURE AND SEARCH (ECF No. 20) (the "Motion to Suppress"). On November 6, 2024, the Court entered an ORDER (ECF No. 25) that denied the Bruen Motion to Dismiss. On November 18, 2024, the Court entered an ORDER (ECF No. 27) that denied Cell Phone Motion to Suppress because the Government confirmed to the Court that it did not intend to introduce any evidence obtained from the cell phone in prosecuting Richardson.

On January 29, 2025, the Court held an evidentiary hearing on the Motion to Suppress in which LaReesha Greer and Detective Bryan Ferreiras testified. Hearing Transcript, January 29, 2025 ("H.T. 1/29/25"). That same day, January 29, 2025, the Court entered an ORDER (ECF No. 35) that continued the evidentiary hearing to afford the Government additional time to prepare and coordinate the presence of witnesses. On February 25, 2025, the Court held the follow-up evidentiary hearing in which ATF Task Force Officer John Story, Detective Ferreiras, and Richmond Police Officer Andy Harvey testified. Hearing Transcript, February 25, 2025 ("H.T.

2

2/25/25") On March 3, 2025, the Court entered an ORDER (ECF No. 39) that denied the Motion to Suppress and ordered the parties to file a renewed motion to suppress taking into consideration the evidence produced at the evidentiary hearings which differed significantly from the facts asserted in the motion to suppress and related briefing. On April 21, 2025, the Defendant filed the Renewed Motion to Suppress. On May 14, 2025, the Court held a final evidentiary hearing in which Officer Story testified. Hearing Transcript, May 14, 2025 ("H.T. 5/14/25").

The facts underlying this case, as illustrated through the exhibits and the witness testimony, are as follows.

## FACTUAL BACKGROUND

### A. Robbery and Initial Investigation

On July 10, 2024, at approximately 10:33 a.m., two women were robbed by a man with a gun in the parking lot of the James River Villas Apartments on the 2400 Block of Brandy Street in Richmond, Virginia. Stipulated Timeline, Ex. 10 at 1. One of the victims called 911 in the minutes following the robbery. Id. Richmond Police Department ("RPD") K-9 Officer Dixon arrived first on scene, and began to interview the victims. Id.; H.T. 2/25/25 at 13:2-14:10. Officer Dixon was joined shortly thereafter by Officer Yoon, who was working as a uniformed patrol officer. Stipulated Timeline, Ex. 10 at 1; H.T. 2/25/25 at 13:2-14:10. Officers Yoon and Dixon

3

continued to gather information from the victims, and Officer Yoon transmitted over the radio to dispatch that the suspect was possibly armed with a black 9mm handgun. Ex. 10 at 1. Detectives Venable and Echo from the Second Precinct Property Crimes Unit arrived at the scene about eight minutes later. Id.; H.T. 2/25/25 at 92:4-13.

As stated above, Officers Dixon and Yoon interviewed the victims following the robbery. Officer Dixon BWC Footage, Ex. 12; Officer Yoon BWC Footage, Ex. 13. One of the victims had initially given to the 911 operator the following description of the perpetrator: "black male, 19-20 years of age, wearing all black, last seen carrying a bag with little bears on it." Radio Transmissions Transcript, Ex. 1A at 00:48-01:01; Victim's 911 Call Transcript, Ex. 11A (when asked to describe the perpetrator's clothes, the victim responded "[a]ll black. A black, a black jacket, black pants, and black shoes"). After having a few minutes to collect themselves, the victims described the perpetrator to Officer Dixon as a black male in his mid-20s, wearing a gray jacket and black pants and carrying a pink bag with bears on it. Transcript of Officer Dixon BWC Footage, Ex. 12A at 1-2. Officer Dixon relayed the following description over the radio: "black male, mid-20s, gray jacket, black pants, last seen on foot running toward Bellemeade toward the apartments . . . he did fire two rounds in the air, there are shell casings out here." Ex. 12 at

4

10:40:14-10:40:54; Ex. 12A at 3; Ex. 1A at 2:38-3:09. The victim also advised that the perpetrator's height was around the same as Officer Dixon, who testified that he was 6 feet tall. Transcript of Officer Yoon BWC Footage, Ex. 13A at 2. The victims further described the perpetrator as "skinny," said he was "a little bit darker than [them]," had no facial hair, and that his haircut was "let's just say low, I kind of, I was focused on him going in on us, but it was probably close to no hair but a little bit probably." Ex. 13A at 2-3. The victims also informed the officers that they were loading their two babies into their vehicle when the perpetrator walked up to the from behind, pointed a black handgun at them, fired two rounds into the air, and then snatched the victims' belonging from their persons and their vehicle. Ex. 12A at 2-4; Ex. 13A at 1-3. The perpetrator then reportedly fled in a northerly direction toward the Bellemeade Rd./Afton Ave. area. Ex. 12A at 4.

After the interviews with the victims were completed, multiple Richmond Police Department officers canvassed the surrounding neighborhood. The James River Villas Property Manager, LaReesha Greer, testified that she spoke with one of these canvassing officers who came to the management office for the property. H.T. 1/29/25 at 4:14-5:18, 8:6-12. It remains unclear

who this officer was.[1] Ms. Greer recalls that the officer asked to review the security camera footage from the property. Id. at 5:16-6:10. Ms. Greer asked for a description of the suspect, and she reports that the officer described the suspect as a young black male, in his early 20s, wearing a gray top, blue jeans, and white sneakers. Id. at 8:22-10:8. Ms. Greer then allowed the officer to search through the surveillance footage that was available in the leasing office, but she did not stay in the room with the officer while he reviewed that footage. Id. at 13:10-14:18. Later that day, after Ms. Greer made the call to police concerning the suspicious man at the bus stop. Detective Ferreiras then went to the James River Villas Property and spoke with Ms. Greer. H.T. 2/25/25 at 24:2-25:4. Detective Ferreiras has confirmed that he had not spoken with Ms. Greer about the robbery at issue before her 911 call. Id.

During the investigation of the robbery, Detective Ferreiras canvassed the area for evidence. He obtained surveillance footage, a short clip totaling 12 seconds, from an adjacent property that

---

[1] Ms. Greer was unable to recall the name of the officer and was also unable to recall if she had talked to one officer or more. H.T. 1/29/25 at 9:9-14, 26:5-20. The Government undertook significant investigation but was unable to discover who this officer purportedly was. See H.T. 2/25/25 at 1-11 (Task Force Officer Story explaining that he interviewed every RPD police officer, police sergeant, and police detective who was working in the Second Precinct at the date and time of the robbery, and none of them recalled speaking to Ms. Greer and providing the suspect description to her).

captured the robbery in action. Ex. 8. The video is grainy and not of sufficient quality to show the perpetrator's face. Id. The initial investigation into the robbery did not lead to the apprehension of the perpetrator, and detectives took over the case moving forward.

### B. 911 Call

Around two hours later, Ms. Greer was driving around The James River Villas apartment complex as part of her daily routine to survey the surrounding area for potential maintenance needs. H.T. 1/29/25 at 8:10-21, 14:20-15:9, 28:10-19. While doing so, Ms. Greer saw a young black man whom she believed matched the description of the perpetrator that the RPD officer had given her based on "the outfit, the age, the color" of that individual. Id. at 15:10-16:9; Greer 911 Call Transcript, Ex. 7 at 2. Ms. Greer was suspicious of this individual for two additional reasons: (1) he was wearing a hooded sweatshirt, with the hood on, during a day when it was about 95 degrees outside; and (2) the hooded sweatshirt's front pocket was weighed down by something heavy inside (which she thought could be a weapon). H.T. 1/29/25 at 17:10-18:12; Ex. 7A at 1 ("it looks like he's got some type of weapon in his pocket.'). Based on the RPD officer's description and these additional two suspicions, Ms. Greer called 911 and explained to the operator that she had seen the robbery suspect. She stated, in relevant part:

L.G. No, ma'am. I'm the manager in an apartment complex, and one of my residents got robbed . . . and I could be wrong, but, while I was out patrolling my property, I just saying, this what they were looking for. And then his sweatshirt is heavy in the front, like there's something in his pocket.

911: So the person's description that was gave fits the description of the man at the bus stop, is that correct?

L.G.: Yes, ma'am. […]

L.G.: Well, he fired off two shots earlier when he robbed my tenant. I don't see any weapons but again the front of his sweatshirt looks heavy, so I don't know what's inside of his sweatshirt.

911: Okay, so he possibly has something in his sweatshirt, is that correct?

L.G.: Correct, that's what it looks like.

911: Alright, and what's suspicious about the person?

L.G.: Not suspicious, but he just matches the description.

911: So he fits the description of the robbery suspect, is that correct?

L.G.: Yes. Based on the outfit, the age, the color.

911: Alright. So, where is the person now, at the bus stop is that correct?

L.G.: Yes, I'm not at the bus stop anymore, I'm about to bust another u-turn.

911: I need to get that person's description starting with his race: is he black, white, Asian, hispanic, or another race?

L.G.: Black . . . about 22 . . . [wearing] a Nike, gray sweatshirt, and he has the hood over his head, and he has on blue jeans, light blue jeans, and his sneakers look white with some type of coloring.

911: White sneakers with coloring, correct?

L.G.: Mmhmm.

Ex. 7A.

The individual that Ms. Greer had spotted was Richardson. At that time, Richardson was at a bus stop about two blocks away from where the robbery had occurred.

## C. Arrest of Richardson

Officer Andy Harvey typically works the late-night patrol shift, 4:00 p.m. to 3:30 a.m., in RPD's Second Precinct, but was asked to come into work early on July 10, 2024, from 11:00 a.m. to 4:00 p.m., to help cover another shift for the RPD's Second Precinct. H.T. 2/25/25 at 43:4-44:14. At that time, Officer Harvey had been with the RPD for approximately five (5) years, had previously spent eight (8) years with the City of Hopewell Police Department, and over one (1) year with the County of Hanover Police Department. Id.

During that afternoon shift, Officer Harvey was monitoring the Second Precinct wide radio channel. Id. at 44:15-21. At 12:42 p.m., the dispatch officer ("dispatch" or "dispatch broadcast") for the Second Precinct put a call over the radio for a suspicious male who matched the description of the robbery suspect. Id. at 44:18-47:2; Ex. 10 at 1. The dispatch broadcast stated: "Be advised we have a suspicious person call coming in for Bellemeade and

9

Richmond Highway. The description of the suspect matches the description of the suspect on your [Officer Yoon's] call." Ex. 1A at 7:19-7:40. Dispatch then added: "Complainant states she's in the leasing office, sees a black male age 22, grey Nike sweatshirt with a hood, white sneakers, light blue jeans, at the bus stop, which she believes matches the description of the suspect from the robbery from this morning." Id. at 7:48-8:28.

Officer Harvey was driving north on Richmond Highway near the bus stop when the call regarding the suspicious person came over the radio. H.T. 2/25/25 at 46:25-47:6 (Officer Harvey: "I was in the area. I was driving north on Richmond as it came out. And part of being a good officer is realizing where you are. And if a call is nearby, you respond to it."). Before the dispatch call, Officer Harvey was not aware that a robbery had taken place in the Bellemeade/Richmond Highway area two hours earlier, nor had he seen any surveillance footage of the robbery. Id. at 46:3-47:16. Officer Harvey replied to the dispatch that he would respond to the suspicious person call and asked that dispatch repeat the suspect's description. Ex. 1A at 8:28-9:05. After dispatch repeated the description, Officer Harvey turned his vehicle around and began driving to the bus stop where the reported suspicious person was located. Id. at 8:49-9:11; H.T. 2/25/25 at 46:20-51:2. The Call Details (Ex. 2) were pushed to Officer Harvey's vehicle

laptop and he read them there. H.T. 2/25/25 at 48:13-49:17. The
Call Details stated the following:

| | |
|---|---|
| 07/10/24 12:38:43 (ecc-t1) : | Chief Complaint: SUSPICIOUS person Problem: COMPL STATED SHE IS A PROPERTY MANAGER AND A RESIDEN T WAS TROBBED THIS MORNING THE PERSON DESCRIPTION FITS THE DESCRIPTION OF THE MAN AT BUS STO P |
| 07/10/24 12:38:43 (ecc-t1) : | Dispatch Code: 129C01 (SUSPICIOUS person) Response Text: Charlie ------ 3rd pty caller not on scene. ------ Su spicious because: HE FITS THE DISCRIPTION OF THE PERSON WHO ROBBED HER RESIDENT IN AREA ------ No k nown wpns inv: – but caller rpts: BUT HE POSSIBLE HAVE SOMETHING IN HIS SWEAT SHIRT ------ SUSPICIOUS person ------ In progress. |
| 07/10/24 12:39:41 (ecc-t1) : | Response Text: Charlie Person : (Suspect): ... Race: BLACK ... Sex: MALE ... Age: 22 ... Clothing: NIKE GREAY SWEA T SHIRT HOOD. LIGHT BLUE JEANS WHITE SNEAKERS WITH A COLOR IN I |
| 07/10/24 12:39:59 (ecc-t1) : | Response Text: Charlie ------ Susp on scene: AT THE BUS STOP ------ Susp desc: ------ Unk how susp arrived. |
| 07/10/24 12:40:11 (ecc-t1) : | Response Text: Charlie |
| 07/10/24 12:40:54 (ecc-t1) : | COMPL STATED THAT IF NEEDED SHE IS GOING TO BE IN THE LEASING OFFICE |

Ex. 2. Of particular importance, the Call Details stated that "the
[robbery suspect's] description fits the description of the man at
bus stop," and that there were no known weapons involved but the
caller reported that suspect may "have something in his
sweatshirt." Id. While on his way to the bus stop, Officer Harvey
spoke quietly to himself saying, "remarks . . . possibly has
something in his sweater." Officer Harvey BWC Footage, Ex. 4 at
12:44:09-12:44:20.

    At the same time, Detective Ferreiras heard the robbery
suspect call come over the Second Precinct radio channel. H.T.
2/25/25 at 25:6-26:5. Shortly thereafter, Detective Ferreiras

11

called Ms. Greer (just before 12:46 p.m.) to confirm the details of her call to 911. Id. They spoke on the phone for less than a minute. Id. at 34:7-11. Detective Ferreiras compared the information that Ms. Greer provided to him about the individual at the bus stop with the information that he had compiled about the robbery suspect and determined that the two descriptions did not match. Id. at 27:21-28:22. So, at 12:46 p.m., Detective Ferreiras broadcasted the following message on the Second Precinct radio channel: "[in] reference [to] the suspicious from Bellemeade/Richmond, **you guys can disregard that**, I actually spoke to the manager at the leasing office, and **he doesn't match the description of the person we're looking for**." Ex. 1A at 9:22-9:48 (cleaned up and emphasis added); Ex. 10 at 2. Dispatch then sought to confirm that Officer Harvey received that information, stating, "213 Charles [Officer Harvey], do you copy?" Ex. 1A at 9:43-9:51. However, Officer Harvey did not confirm receipt of the "disregard" message because, when that message was sent, he was chasing after Richardson who was in headlong flight.

It is now necessary to back up approximately one minute before Detective Ferreira's radio message to the moment that Officer Harvey arrived at the bus stop. At 12:45 p.m., Officer Harvey pulled up to the bus stop driving an RPD marked police car. Officer Harvey was wearing an RPD-issued uniform and was openly displaying his badge. Ex. 10 at 1; H.T. 2/25/25 at 61:15-23. Officer Harvey

purposefully parked "about 20 yards away" from the suspect as a safety precaution. H.T. 2/25/25 at 59:7-60:3; see Ex. 4 at 12:45:15. Officer Harvey exited the marked police vehicle. He took a few steps towards the individual matching the description from the Call Details (who happened to be Richardson) before he asked: "hey man, let me talk to you?" Id. at 62:6-19; Ex 4. at 12:45:15-12:45:20. Richardson immediately turned in the opposite direction and began running away at a full sprint. Ex. 4 at 12:45:21-12:46:26. Officer Harvey began pursuit and followed Richardson across a major roadway, through a parking lot, and down streets and alleyways between houses. Id.

During the chase, Officer Harvey attempted to put calls out over the radio to inform dispatch and other nearby officers that he was in pursuit of the suspect and to update them on his location. Id.; H.T. 2/25/25 at 65:7-69:10. When doing so, Officer Harvey encountered an audible tone that denoted that someone else was on the air. Ex 4 at 12:45:21-12:46:26; H.T. 2/25/25 at 70:1-72:23. The record suggests that the person on the line was Detective Ferreiras advising that the suspicious personal alert for the robbery suspect should be disregarded. Officer Harvey continued to chase Richardson, and while so doing sent the radio message: "it's gonna be the robbery suspect," referencing the person he was chasing. Ex. 4 at 12:46:02-12:46:06; Ex. 1 at 9:39-9:45; H.T. 2/25/25 at 65:7-69:10.

Thus, the record establishes that, while Officer Harvey was in active pursuit of Richardson, the "you guys can disregard" transmission from Detective Ferreiras came over the radio (Ex. 10 at 2) but that Officer Harvey did not hear that radio transmission while he was in pursuit because at various points during the chase he was on the air himself, thereby blocking incoming radio transmissions, and was running swiftly which caused his duty belt, the vest, the wind, and his radio to move around nosily blocking the sound of the radio transmissions. H.T. 2/25/25 at 70:1-73:14. Officer Harvey's next radio transmission was "I've got one in custody," after he had apprehended Richardson. H.T. 2/25/25 at 65:7-69:10. The chase lasted for approximately one minute and five seconds. Ex. 4 at 12:45:21-12:46:26.

At the end of the chase, Richardson had entered the yard of 2508 Warwick Avenue where he voluntarily laid down on the ground. Ex 4 at 12:46:00-12:46:25. When approaching the then prone Richardson, Officer Harvey gave the command "let me see your hands." Id. And, as he closed in on Richardson, Officer Harvey drew his service weapon and commanded Richardson to "get the fuck on the ground" and then twice told him to remain "face down." Id. Officer Harvey then handcuffed Richardson, rolled him onto his side, and began patting him down "for firearms and other weapons to include knives." H.T. 2/25/25 at 76:3-78:6; Ex. 4 at 12:46:25-12:47:30. He patted down his outer clothing around the area of his

14

hoodie pocket, waistband, and pants pockets. Id. Officer Harvey felt a "hard, cylindrical object" in Richardson's right front pants pocket," which he recognized as a magazine for a semi-automatic pistol. Id. He then retrieved a loaded Glock 9mm magazine from that pocket. Id.

Officer Harvey then helped Richardson to his feet, and they walked back along the chase route until Officer Urban approached in his vehicle. Ex. 4 at 12:47:30-12:50:35. Richardson maintained that he did not have a gun, but only the "clip." Id. When Richardson and Officer Harvey arrived at Officer Urban's vehicle, Officer Harvey began the process of handing custody of Richardson over to Officer Urban and advised that he would retrace the chase route to search for the gun because he had briefly lost Richardson during the chase. Id. But before doing so, Officer Harvey completed an additional pat down of Richardson for weapons as part of his safety routine before ceding custody of Richardson to Officer Urban. Id.; H.T. 2/25/25 at 84:12-86:22. During that pat down, Officer Harvey felt several circular-shaped objects in a bulge in Richardson's front right pocket that felt like pills inside a plastic bag. H.T. 2/25/25 at 84:12-86:22. He then retrieved from Richardson's front right pants pocket a plastic bag that contained blue "Perc-30" pills (later confirmed to be fentanyl). Id.; Ex. 4 at 12:47:30-12:50:35.

Additional officers responded to help Officer Harvey retrace the chase route to find the firearm for the magazine that had been found in Richardson's pocket. Ex. 4; H.T. 2/25/25 at 87:1-89:5. During that search, Officer Harvey located an additional loaded 9mm magazine along the chase route. Id. A K-9 unit was brought to assist with the search, and the dog discovered a 9mm Glock 19 handgun about 5-10 feet into an area of heavy brush that was near the location where Richardson had stopped running and laid down. Id.; Ex. 14, 14:00:00-14:00:50. The loaded handgun was equipped with a machine gun conversion device. H.T. 2/25/25 at 87:1-89:5. The record establishes the foregoing evidence by a preponderance of the evidence. Those facts provide the basis for resolving the Renewed Motion to Suppress.

## DISCUSSION

### A. Reasonable Suspicion: Legal Standard

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "The protection against unreasonable seizures includes 'brief investigatory stops.'" United States v. Curry, 965 F.3d 313, 319 (4th Cir. 2020), (quoting United States v. Kehoe, 893 F.3d 232, 237 (4th Cir. 2018)). These stops, referred to as Terry stops, "are not subject to the Fourth Amendment's higher standards for probable cause and warrant requirements." Id. (citing United

States v. Holmes, 376 F.3d 270, 275 (4th Cir. 2004). Instead, "[u]nder well-established doctrine, a police officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop—known as a 'Terry stop'—predicated on **reasonable, articulable suspicion that 'criminal activity may be afoot.'**" United States v. Mitchell, 963 F.3d 385, 390 (4th Cir. 2020) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)) (emphasis added). This reasonable suspicion need not rise to the level of probable cause but "'requires at least a minimal level of objective justification for making the stop.'" Id. (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). In deciding whether reasonable suspicion exists, courts consider "'the totality of the circumstances—the whole picture.'" United States v. Sokolow, 490 U.S. 1, 8 (1989) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Importantly, "[f]acts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigative stops 'based on what they view as suspicious—albeit even legal—activity.'" Mitchell, 963 F.3d at 390 (quoting United States v. Perkins, 363 F.3d 317, 326 (4th Cir. 2004)). The Government has the burden to prove by a preponderance of the evidence that the Terry stop at issue did not violate the Fourth Amendment. United States v. McGee, 736 F.3d 263, 269 (4th Cir.

2013) ("the government has the "burden of proof in justifying a warrantless search or seizure").

**B. Moment of Seizure**

When undertaking the reasonable suspicion analysis, the preliminary decision is when Richardson was seized. Only after the moment of seizure is established may courts determine if reasonable suspicion justified the seizure. See, e.g., United States v. Peters, 60 F.4th 855, 862 (4th Cir. 2023) ("we must first establish when he was seized, and then determine if reasonable suspicion justified the seizure."). "A seizure, as understood under the Fourth Amendment, occurs '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" Id. (quoting Terry, 392 U.S. at 19 n.16, 88 S.Ct. 1868). "This is measured by whether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion)). A "seizure," occurs when an officer employs "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." Torres v. Madrid, 592 U.S. 306, 311, 141 S. Ct. 989, 995, 209 L.Ed.2d 190 (2021) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868) (alteration in original). "Unlike a seizure by force, a seizure by acquisition of control involves either

voluntary submission to a show of authority or the termination of freedom of movement." Id. at 322.

Richardson contends the parties appear to be in agreement over the moment of seizure, but a close review of their arguments shows that their views are not totally aligned. Richardson states that "[t]he parties appear to agree that the Fourth Amendment seizure began when Mr. Richardson submitted to Officer Harvey's commands to stop running and get down on the ground." Sup. Reply at 1. The Government argues that the Terry stop occurred "when Richardson laid down on the ground and Officer Harvey got on top of him, at the end of the foot pursuit." Sup. Resp. at 1. Richardson posits that "there was a seizure under the Fourth Amendment at the time he stopped running and laid down, in obedience to Officer Harvey's commands, in the back yard." Richardson Sup. Mem. at 1. Although similar, Richardson's argument is that he was seized at the moment that he laid down in response to Officer Harvey's commands, and not at the moment Officer Harvey physically constrained him.

An examination of the timeline is helpful in deciding the moment of seizure. After spotting the suspect at the bus stop who matched the description in the dispatch call, Officer Harvey pulled his police vehicle up to the curb about 20 yards away from the suspect. Officer Harvey stepped out of the vehicle, took a few steps, and then stated to Richardson, "hey man, let me talk to

you." Ex 4. at 12:45:15-12:45:20. Richardson immediately entered headlong flight in the opposite direction of Officer Harvey. That initial question does not amount to a seizure for purposes of the Fourth Amendment because Richardson did not submit to the authority of the question and because he began evading any constraint on his freedom of movement through his flight. See Torres, 592 U.S. at 322, 141 S. Ct. 989 ("a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement.")

Richardson continued to evade Officer Harvey throughout the chase and refused Officer's Harvey's commands to "stop" or "stop right there." Ex. 4 at 12:45:30-12:45:55. Officer Harvey continued the pursuit through a major roadway, a parking lot, and then started following Richardson through alleyways between houses. Id. at 12:45:21-12:46:26. Almost a minute into the chase, Richardson entered the yard of 2508 Warwick Avenue and laid down on the ground. Id. at 12:46:00-12:46:25. Officer Harvey gave Richardson the command "let me see your hands" and then drew out his service weapons and commanded "get the f**k on the ground, face down." Id. Officer Harvey repeated the command "face down" again. Id. Richardson complied and turned over fully onto his stomach with his face down. Id. At that moment the seizure of Richardson was completed because he had voluntarily submitted to Officer Harvey's "show of authority" (his command to get on the ground face down).

Torres, 592 U.S. at 322, 141 S. Ct. 989. Thereafter, Officer Harvey physically constrained Richardson. However, Officer Harvey physically constraining Richardson occurred after the moment of the seizure.[2]

### C. Officer Harvey's Reasonable Suspicion

Before assessing whether, based on the totality of the circumstances, Officer Harvey had adequate reasonable suspicion based on the surrounding circumstances at the moment of seizure, it is necessary to decide a second preliminary issue. That issue is whether the tip called in by Ms. Greer can be considered, in part or in its entirety, in determining Officer Harvey's reasonable suspicion, or if it is unreliable and should be excised from that analysis.

#### i. Reliability of Ms. Greer's Tip

Richardson's position is that the analysis of the reliability of Ms. Greer's tip should be divided into three parts: (1) Ms. Greer's description of Richardson at the bus stop; (2) Ms. Greer's assertion that Richardson matched the description of the robbery suspect; and (3) Ms. Greer's statement that Richardson may have a

---

[2] Deciding the difference between these two moments of seizure is material to this case because the Government argues that the reasonable suspicion that Richardson was the robbery suspect was supported when Officer Harvey saw a black object in Richardson's pocket when physically constraining him. Because Officer Harvey did not see the black object in Richardson's front pocket until after Richardson was seized, that fact does not play a role in the reasonable suspicion analysis.

weapon in the front pocket of his hoodie. Sup. Mem. at 2. The Government takes the view that the tip should be assessed as a whole and that the entirety of Ms. Greer's tip should be treated as reliable. Thus, the tip should be considered in assessing Officer Harvey's reasonable suspicion. Sup. Resp. at 3-8. We will examine each of Richardson's sub-arguments in turn.

(a) Description of Richardson and Fact of Robbery

In her 911 call, Ms. Greer stated that a black male, wearing a Grey Nike hoodie, light blue jeans, and white sneakers with coloring, was standing at the bus stop on Richmond Highway and Bellemeade. Ex. 7A at 1-2. Richardson agrees that the Court may consider Ms. Greer's description of Richardson in its reasonable suspicion analysis because the description was based on her first-hand observation of Richardson at the bus stop and was corroborated by Officer Harvey own observations of Richardson. Sup. Mem. at 2-3. Importantly, Richardson also agrees that the statement by Ms. Greer that she was making the 911 call after s robbery had occurred "nearby" can be considered because it was well-established and corroborated, and because Ms. Greer's role as a property manager "made it fairly likely that she would be aware of the robbery." Id. at 3. The Court agrees that those statements can be considered as part of the reasonable suspicion analysis because the information that Ms. Greer gave was reliable and was based upon her own personal knowledge. Ex. 7A at 2 (Ms. Greer confirming her

description of Richardson, stating, "Black . . . about 22 . . . [wearing] a Nike, gray sweatshirt, and he has the hood over his head, and he has on blue jeans, light blue jeans, and his sneakers look white with some type of coloring."); id. at 1 (Ms. Greer confirming that she was aware of the robbery, stating, "earlier this morning one of my tenants got robbed").

### (b) Matching Descriptions

Second, Ms. Greer stated that the individual at the bus stop, Richardson, matched the description of the suspect for the robbery that had occurred two hours earlier at the James River Villas apartment complex. See Ex. 7A. In fact, Ms. Greer confirmed on three separate occasions during the 911 call that the individual matched a description of the robbery suspect that had been given to her. See, e.g., id. ("911: So he fits the description of the robbery suspect, is that correct? L.G.: Yes. Based on the outfit, the age, the color.").

The analysis of an officer's suspicion of criminal activity is complicated when it is not based on the officer's own personal knowledge and observations, but instead is based on information provided by a tipster. The Supreme Court has considered the reliability of tips from anonymous tipsters in determining the propriety of Terry stops in several cases, most notably in Florida. v. J.L., 529 U.S. 266 (2000). In J.L., the Supreme Court held that

an anonymous 911 call must be corroborated to create sufficient
indicia of reliability:

> An accurate description of a subject's readily
> observable location and appearance is of course reliable
> in this limited sense: It will help the police correctly
> identify the person whom the tipster means to accuse.
> Such a tip, however, does not show that the tipster has
> knowledge of concealed criminal activity. **The reasonable
> suspicion here at issue requires that a tip be reliable
> in its assertion of illegality, not just in its tendency
> to identify a determinate person.** Cf. 4 W. LaFave, Search
> and Seizure § 9.4(h), p. 213 (3d ed.1996)
> (distinguishing reliability as to identification, which
> is often important in other criminal law contexts, from
> reliability as to the likelihood of criminal activity,
> which is central in anonymous-tip cases).

529 U.S. 266, 272 (2000) (emphasis added). In J.L., an unidentified
person called the police and reported that an African-American man
who had a gun and who was wearing a plaid shirt was standing at a
bus stop. Id. at 268. No audio recording of the call existed, and
nothing was known about the informant. Id. Police officers
responded to the call, and saw three black males at the bus stop,
and one of the men was wearing a plaid shirt. Id. The Court held
in J.L., that an unreliable tip, standing alone, did not give the
officer reasonable suspicion to effectuate a Terry stop on the man
wearing the plaid shirt. Id. at 268. Richardson relies on J.L. to
argue that some of Ms. Greer's statements during the 911 call are
unreliable. However, courts have been more willing to find tips
reliable when they come from a known informant whose credibility
can be tested and who may be subjected to legal repercussions for

making false allegations. See United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (finding that a face-to-face "conversation with the informant provided [the officer] with an opportunity to assess her credibility and demeanor" and that "unlike [an] anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements."). In Christmas, the Fourth Circuit found that a tip from a citizen informant who had provided police with her home address in a face-to-face encounter was sufficiently trustworthy and was "more trustworthy and reliable than the anonymous tip at issue in J.L." 222 F.3d at 144-145.

Ms. Greer's tip lies between the face-to-face conversation with police officer in Christmas and the fully anonymous tip in J.L. See, e.g., United States v. Mitchell, 388 F. App'x 328, 331 (4th Cir. 2010) ("in reality, tips fall on a spectrum of reliability" and do not fit neatly into the "two stark categories that are wholly anonymous or wholly non-anonymous tips."). Ms. Greer identified herself by giving her name to the 911 operator and her role as an apartment complex manager, and then informed the 911 operator that she was calling regarding an earlier robbery of one of the residents of her building. Ex. 7A at 1. At the end of the call, Ms. Greer stated that she did not wish to speak with officers when they arrived but "if they have any questions for me" that she would be at the leasing office of her apartment complex.

Ex. 7A at 2. Unlike the tipster in Christmas, Ms. Greer was not speaking with the officer in a face-to-face interaction, where the officer would have the opportunity to check her credibility and veracity in real time. Instead, she gave the tip to a 911 operator over the phone. See Christmas, 222 F.3d at 144-45 (finding that a tipster who directly approached police in a face-to-face encounter was "more trustworthy and reliable than the anonymous tip at issue in J.L.") (citing Adams v. Williams, 407 U.S. 143, 146-47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[T]hough the informant in the present case had not previously been relied on by the officers, a face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster.").

On the other hand, Ms. Greer positively identified herself to the 911 operator and stated that she would be available to answer further questions if needed. Ex. 7A at 3. Ms. Greer's credibility is, thus, boosted by the opportunity for police to check the veracity of the tip and to follow up by speaking with her in person as she had offered. Christmas, 222 F.3d at 144 ("Unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements. As the Supreme Court has observed, citizens who personally report crimes to the police thereby make themselves accountable for lodging false complaints.") (citing Illinois v. Gates, 462 U.S. 213, 233-34, 103

S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The Fourth Circuit found in Mitchell that "sufficient information given to accurately identify [a 911 caller] . . . lends support to [the tipster's] credibility." Mitchell, 388 F. App'x at 332 (internal citations and quotations omitted).

However, because this case does not fall cleanly into the known informant format, where the law enforcement officer law enforcement officer "can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion," further analysis of the veracity and credibility of Ms. Greer's tip is necessary to determine if there existed sufficient indicia of reliability to allow consideration of the tip in the reasonable suspicion analysis. United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004) ("In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability.") (citations omitted).

The facts of this case ultimately reveal that Ms. Greer's statements that Richardson matched the robbery suspect lack the required indicia of reliability. Ms. Greer stated during the 911 call that she was calling the tip in for an individual who matched the description of the robbery suspect that an officer had given her earlier. Ex. 7A at 1 ("Earlier this morning one of my tenants got robbed, and the officer gave me a description [of the

27

suspect].") Ms. Greer later testified that she had received the following description from the police officer of the suspect: African American male in his early twenties wearing a grey top, blue jeans, and white sneakers. H.T. 1/29/25 at 10:5-12. Ms. Greer does not recall any further description being provided to her by the officer. Id. The underlying issue with accepting as reliable Ms. Greer's identification of Richardson as the robbery suspect is threefold: (1) her purported description of the robbery suspect does not align with the description that RPD had of the robbery suspect; (2) there is substantial doubt whether any RPD officer provided Ms. Greer with a description of the robbery suspect; and (3) Detective Ferreiras stated to Officer Story that Ms. Greer called 911 only because Richardson was a black male in the area after the robbery.

To begin, the description that Ms. Greer said she had received from a RPD officer was that the robbery suspect was wearing a grey top, blue jeans, and white sneakers. H.T. 1/29/25 at 10:5-12. That does not match the description that the RPD received from the victims. Officer Dixon put the following description out over the radio after speaking with the victims: "black male, mid-20s, gray jacket, black pants[.]" Ex. 12 at 10:40:14-10:40:54; Ex. 12A at 3; Ex. 1A at 2:38-3:09. Ms. Greer made the phone call to 911 at approximately 12:41 p.m., and dispatch put out the call for the suspicious person at 12:42 p.m.

Around two or three minutes later, about 12:45 p.m., Detective Ferreiras called Ms. Greer to confirm the details of the tip. It took Detective Ferreiras less than a minute on the phone with Ms. Greer to dispel the notion that Richardson was the robbery suspect because the two respective descriptions simply did not align. That is why Detective Ferreiras put out a disregard transmission immediately. That evidence teaches that Ms. Greer's tip was lacking in its veracity.

Next, Ms. Greer's credibility has been effectively called into question because there is no proof that any RPD officer gave her the description on which she claims to have relied. Ms. Greer has testified that she cannot recall which officer provided her with the description of the robbery suspect. H.T. 1/29/25 at 9:9-14, 26:5-20. The Government has also been unable to determine that officer, even after undertaking a significant investigation in which they interviewed all officers on duty in the RPD's Second Precinct on the day in question. See H.T. 2/25/25 at 1-11 (Task Force Officer Story explaining that he interviewed every RPD police officer, police sergeant, and police detective who was working in the Second Precinct at the date and time of the robbery, and none of them recalled speaking to Ms. Greer or providing the suspect description to her). That evidence further calls into question the reliability of the tip.

Finally, the credibility of Ms. Greer's tip is compounded by troublesome testimony from Officer Story. On October 24, 2024, Officer Story interviewed Detective Ferreiras about the events that had taken place during the investigation into the robbery. H.T. 5/15/25 at 12:9-13:7. Officer Story asked Detective Ferreiras "if he knew how or why Ms. Greer had placed the call for service for the male at the bus stop matching the description of the robbery suspect." Id. Detective Ferrerias responded affirmatively and informed Officer Story that "he believed she placed the call for service based on information she had received from another tenant regarding the robbery but also that she simply saw him and called because he was a black male in the area." Id.[3] That testimony directly contradicts Ms. Greer's testimony about what she said on the 911 call. Based on the record as a whole, the statements made by Ms. Greer that Richardson matched the description of the robbery suspect are so lacking in indicia of reliability that they cannot inform Officer Harvey's reasonable suspicion.

The Government argues that the reliability of Ms. Greer's tip is bolstered by the fact that she provided an accurate description of Richardson standing at the bus stop and because she was a "first-hand-observer" who was "presen[t] at the location of the

---

[3] Detective Ferreiras has a working relationship with Ms. Greer, and that is the ground upon which that lay opinion would have been based. See H.T. 2/25/25 at 36:8-13 (Detective Ferreiras has worked with Ms. Greer on more than twenty previous occasions).

incident." Sup. Resp. at 3. That argument is without merit. The Supreme Court has foreclosed courts from relying solely upon an accurate description in determining that a tip is reliable without further factual support. In J.L., the Supreme Court held that, even when a tipster provided "an accurate description of [the defendant's] readily observable location and appearance", which "help[ed] police correctly identify the person whom the tipster means to accuse" that, without any corroborating information, the tip was still not reliable and would not be considered. 529 U.S. at 272. Here, as discussed above, the statements from Ms. Greer are otherwise lacking in any indicia of reliability to allow them to be considered. Further, the Government's contention that Ms. Greer was a "first-hand-observer" is not factually accurate. Ms. Greer has testified that she was not a witness to the robbery and that she had not spoken to the victims of the robbery prior to speaking to the officer who allegedly provided her with the description. H.T. 1/29/25 at 7:20-8:5; 29:13-18 ("My leasing consultant may have spoken with [the robbery victims] but I did not."). Ms. Greer cannot have based her statements that Richardson matched the description robbery suspect on any personal knowledge of the robbery because she has testified that she did not have any personal knowledge of the robbery.

### (c) Statement that Richardson May Have a Weapon

The final portion of the tip that Richardson argues cannot be considered is the statement made by Ms. Greer that Richardson may have a weapon. During the 911 call, Ms. Greer initially stated to the operator that "it looks like [Richardson's] got some type of weapon in his pocket." Ex. 7A at 1. Ms. Greer then went on to tell the operator that "his sweatshirt is heavy in the front, like there's something in his pocket." Id. The operator eventually followed up with the question, "are there any weapons involved?" Id. Ms. Greer responded, "Well, he fired off two shots earlier when he robbed my tenant. I don't see any weapons but again the front of his sweatshirt looks heavy, so I don't know what's inside of his sweatshirt." Id.

Ms. Greer's statement that Richardson may have a weapon on his person does not require an analysis as to its reliability because that statement was never communicated to Officer Harvey before he approached Richardson. The call details only stated that "HE POSSIBLE HAVE SOMETHING IN HIS SWEAT SHIRT." Ex. 2. Therefore, the uncommunicated statement that Richardson may have a weapon has no impact whether Officer Harvey had reasonable suspicion to believe that criminal activity was or may be afoot. Also, Richardson agrees that Officer Harvey can consider the portion of the tip in which Ms. Greer provided her description of Richardson at the bus stop that "was the result of her direct observation"

32

and that was "corroborated when Officer Harvey observed the same." Sup. Mem. at 2-3. That report included that he had something heavy in his sweatshirt, which was corroborated by Officer Harvey's report that he saw a bulge in the front of the hoodie when he arrived to the bus-stop. H.T. 2/25/25 at 63 ("Q: Before he took off running, were you able to observe the way he was dressed? A: Yes, sir. . . the hoodie did have a slight bulge on the front pouch."). Thus, the Court can consider the statement communicated from dispatch to Officer Harvey that Richardson possibly had something in his sweatshirt.

## ii. Reasonable Suspicion: Totality of the Circumstances

"Courts consider the totality of the circumstances when deciding whether an officer had reasonable suspicion to support a Terry stop and frisk." United States v. McCullers, 591 F. Supp. 3d 38, 46 (E.D. Va. 2022), aff'd sub nom. United States v. Brown, 114 F.4th 253 (4th Cir. 2024) (citing United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion[.]" Ornelas v. United States, 517 U.S. 690, 696 (1996). "In reviewing police action, courts must look at whether the evidence as a whole establishes

reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" United States v. Bowman, 884 F.3d 200, 213 (4th Cir. 2018) (quoting United States v. Branch, 537 F.3d 328, 336–37 (4th Cir. 2008)).

The Government's theory is that, at the time of the Terry stop, Officer Harvey had reasonable suspicion that criminality was or may have been afoot in two ways: "(1) Richardson being the robbery suspect and (2) Richardson being unlawfully armed with a concealed weapon, in violation of Va. Code § 18.2-308, which criminalizes carrying hidden from common observation guns, various types of knives and other dangerous weapons, nun-chucks, throwing stars, and similar weapons." Sup. Resp. at 2.

To determine the validity of the Government's theory of reasonable suspicion, it is necessary to delineate the totality of the circumstances after excising the portion of Ms. Greer's tip that Richardson matched the robbery suspect. The Government contends that Officer Harvey's reasonable suspicion, divorced entirely from the tip, arises from the following facts:

> (1) [Officer Harvey] had received information from dispatch indicating that a robbery had taken place just a few blocks away and just a couple of hours earlier (over the radio); (2) this was a high crime area, where many gun and drug offenses take place, as well as robberies, prostitution offenses, and other crimes; (3)

Richardson was wearing a hooded sweatshirt in 90+ degree weather, which did not fit the weather and which can be worn to more easily conceal a weapon than in, for example, a thinner article of upper clothing like a t-shirt; (4) on arriving at the bus stop, Officer Harvey observed a bulge in Richardson's hoodie's front pocket, which he thought could be a weapon, like a concealed gun or knife; (5) on arriving and still being a significant distance away from Richardson, as soon as Richardson realized Officer Harvey wanted to talk to him, Richardson took off in headlong and unprovoked flight—and Richardson did this in the middle of the daytime and in public with at least one other person around and where the officer was in a marked police uniform (with police body-worn camera on the front of his uniform) and had emerged from a parked police vehicle—in other words, where Richardson could not credibly claim that he feared for his safety at the officer's hands; (6) during the chase, Richardson crossed lanes of traffic, took multiple turns, and led Officer Harvey on a long foot pursuit, indicating the lengths to which Richardson felt it necessary to escape from Officer Harvey—even though Officer Harvey had only said that he wanted to talk to Richardson (Harvey testified in sum that, in his experience, innocent people usually do not run from him); and (7) when attempting to handcuff and roll Richardson over, Officer Harvey observed something black inside of Richardson's hoodie pocket—and most of the guns Officer Harvey has encountered have been black in color.

Sup. Resp. at 9-10.

Upon review of the Government's argument, and upon consideration of the additional information from the tip that Richardson agrees informs the reasonable suspicion analysis, the Court finds that the totality of the circumstances amount to reasonable suspicion that Richardson was the suspect for the robbery that had occurred a little over two hours prior to Officer

Harvey responding to the bus stop. The facts supporting Officer Harvey's reasonable suspicion are as follows.

On July 10, 2024, Officer Harvey was working an afternoon shift in the Second Precinct in the Bellemeade neighborhood near the Richmond Highway. Officer Harvey had policed in the Second Precinct for about a year prior to the date in question, and, in his experience, he qualifies the Bellemeade neighborhood as a "high crime area" because he was been he was worked calls in that area for "several burglaries, [breaking and enterings], assaults, at least one homicide[], multiple firearm related crimes, such as robberies, armed robberies, discharging firearms into the air, things of that nature." H.T. 2/25/25 at 57:3-8; 58. He has also responded to calls for a significant number of narcotics offenses, theft crimes, and prostitution in that area as well. Id. at 57:13-15. On the day in question, Officer Harvey heard a call over the radio for a robbery suspect at a bus stop near his location. He took the call and dispatch pushed to him the Call Details. While driving to the bus stop, Officer Harvey verbally noted to himself that the Call Details stated that the suspicious individual may have something in his sweatshirt. Ex. 4A at 1 (Officer Harvey: "Remarks . . . possibly has something in his sweater."). Then, from his vehicle, Officer Harvey saw a man that matched the description that was given to the 911 operator by Ms. Greer, Richardson.

36

Officer Harvey, wearing a RPD uniform, pulled up to the bus stop and parked his marked police vehicle about twenty yards away from Richardson. Officer Harvey observed that Richardson was wearing a hooded sweatshirt, despite it being over 90 degrees at that time. H.T. 2/25/25 at 63:1-22. It was in Officer Harvey's experience that individuals often wear lose fitting clothes, particularly hooded sweatshirts, because they more easily concealed weapons or other illegal materials. Id. In addition, Officer Harvey noticed that the sweatshirt had a bulge in the front pocket, where something, in his experience, may have concealed. Id. Officer Harvey stepped out of his vehicle and had only taken a few steps towards Richardson before he asked, "hey man, let me talk to you." Ex. 4 at 12:45:10-12:46:26. Richardson immediately entered an unprovoked, headlong, and prolonged flight away from Officer Harvey. Id. In Officer Harvey's experience, innocent individuals typically do not run away when he asks to speak with them. H.T. 2/25/25 at 64:14-65:2 (At the very moment [Richardson began flight], I thought he was a robbery suspect"). Officer Harvey pursued, and followed Richardson across a major roadway, through a parking lot, and down streets and alleyways between houses. Ex. 4 at 12:45:21-12:46:26. Richardson eluded capture from Officer Harvey for approximately one minute. Id. Officer Harvey lost sight of Richardson, on at least one occasion, which allowed Richardson

37

a possible opportunity to discard any illegal materials that he had on his person. Id.

In sum, Officer Harvey responded to a call for a suspicious person in a high-crime area in which a robbery had recently occurred. He then found Richardson suspiciously wearing a hooded sweatshirt out of season with a bulge in the pocket (in his experience indicating the possibility of a hidden weapon) and asked to speak with him. United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (finding that courts should "credit[] the practical experience of officers who observe on a daily basis what transpires on the street"). Richardson then immediately entered unprovoked, headlong, and prolonged flight to evade the conversation that Officer Harvey had requested. See United States v. Frazer, 98 F.4th 102, 111 (4th Cir. 2024) ("[T]the Supreme Court's Wardlow opinion in 2000 recognized that a person's 'headlong' and 'unprovoked' flight upon seeing a police officer goes a long way toward establishing reasonable suspicion that the fleeing person was involved in criminal activity.") (quoting Wardlow, 528 U.S. at 124-25, 120 S.Ct. 673). Based on the totality of the circumstances, Officer Harvey had reasonable suspicion that Richardson was a suspect in the robbery that had occurred in the area and that he may have be carrying a concealed weapon. Mitchell, 963 F.3d at 390 (quoting Alabama v. White, 496 U.S. 325, 330 (1990) ("because reasonable suspicion is a less demanding standard, it can arise

'from information that is less reliable than that required to show probable cause.'"). Therefore, Officer Harvey lawfully detained Richardson when he was seized in the yard of 2508 Warwick Avenue.

### D. Richardson Pat-Down: "Armed and Dangerous" Analysis

Finding that Officer Harvey had reasonable suspicion to seize Richardson does not end the Court's Fourth Amendment inquiry because Officer Harvey not only seized Richardson but conducted a Terry frisk of his person as well. During an initial frisk, Officer Harvey located and removed a loaded magazine from Richardson's pocket, and during a second frisk he located a baggie of fentanyl pills.

"Established Supreme Court law imposes two requirements for conducting a frisk, but no more than two: **first**, that the officer have conducted a lawful stop, which includes both a traditional Terry stop as well as a traffic stop; and **second**, that during the valid but forced encounter, the officer reasonably suspect that the person is **armed and therefore dangerous**." United States v. Robinson, 846 F.3d 694, 700 (4th Cir. 2017) (emphasis in original). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27, 88 S.Ct. 1868. In this case, the Government has successfully established both of the requirements for a lawful Terry frisk.

39

The first requirement of a lawful frisk has already been established—Officer Harvey lawfully detained Richardson based on reasonable suspicion that he was a robbery suspect. The second requirement is that Officer Harvey must have reasonably believed that Richardson was "armed and therefore dangerous." Robinson, 846 F.3d at 700. Officer Harvey reasonably believed that Richardson was armed for the same reasons that he had reasonable suspicion that Richardson was the robbery suspect: (1) he had received information that a robbery had taken place in the area, which has been deemed a high-crime area, a couple hours earlier; (2) the Call Details indicated that the individual at the bus stop may have something in his sweatshirt (which was being worn in 95 degree heart), and Officer Harvey corroborated that detail upon seeing the "bulge" in his front pocket; (3) Richardson was wearing a hooded sweatshirt on a hot summer day with 90-plus degree weather; and (4) when Officer Harvey asked to speak with Richardson, he immediately entered unprovoked, headlong, and prolonged flight to evade detention. Taken together, these facts permitted Officer Harvey to conduct a Terry frisk for weapons.

Officer Harvey was justified in removing both the loaded firearm magazine and the baggie of fentanyl pills from Richardson's pockets under the plain feel doctrine. "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent . .

. if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plan-view context." Minnesota v. Dickerson, 508 U.S. 366, 375-76 (1993). "[T]he plain feel doctrine, like the plain view doctrine, only requires that the officer have probable cause to believe that the object is contraband by the time he realizes it is not a weapon." United States v. Jones, 303 F. Supp. 2d 702, 706 (D. Md. 2004), aff'd, 289 F. Appx. 593 (4th Cir. 2008) (citing Arizona v. Hicks, 480 U.S. 321, 327, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)).

Officer Harvey testified that he when he first frisked Richardson, he immediately recognized the "hard, cylindrical object" that he felt in Richardson's pocket to be a magazine for a semi-automatic pistol. H.T. 2/25/25 at 77:5-14. Officer Harvey further testified that when he completed the secondary frisk before handing Richardson over to Officer Urban, he felt a bulge in Richardson's pocket that contained several circular objects that felt like pills inside of it. Id. at 85:19-86:22. It was immediately apparent to Officer Harvey that the circular shaped objects were pills either loose or in a baggie, and he suspected that they may be illegal narcotics. Id. Officer Harvey based these item recognitions upon his experience as a police officer of over 10 years who was conducted and participated in several gun and drug related investigations. During those investigations, Officer Harvey has become familiar from his training and experiences on

the job with how both firearm magazine and pills feel during a pat down. Therefore, Officer Harvey had sufficient probable cause to believe that the items that he felt were contraband, based on how they felt during his pat downs. Here, as in Jones, "[u]pon grasping the object[s] and recognizing [they were a pistol magazine and drugs], [Officer Harvey] was entitled to seize the object[s] under the so-called 'plain feel' doctrine." 303 F. Supp 2d at 706. Thus, there are no Fourth Amendment violations in either the search or seizure of Richardson that allow the suppression of the evidence that is requested by the Defendant.

**E. The Seizure of the Firearm**

Richardson also argues that the seizure of the firearm found during the post-arrest canvas of the flight route is inadmissible as fruit of the poisonous tree. Renewed Motion to Suppress at 13-14. That argument fails for lack of a predicate; Richardson was lawfully seized so there is no poisonous tree.

42

## CONCLUSION

For the reasons set forth above, the DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM SEIZURE AND SEARCH (ECF No. 46) will be DENIED.

It is so ORDERED.

_____ /s/  RЄₚ

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 21, 2025